IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DERRICK E. RODGERS,           )
                              )
        Plaintiff,            )
                              )
v.                            )        CASE NO.  1:13-cv-062-MEF
                              )            (WO – Do not Publish)
UNITED PARCEL SERVICE, INC.,  )
                              )
        Defendant.            )

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United Postal Service, Inc.'s ("UPS") Motion for Summary Judgment (Doc. #21).  This is an employment discrimination case brought by Plaintiff Derrick E. Rodgers ("Rodgers") against his employer, UPS, for alleged racial discrimination based on UPS's failure to promote Rodgers from his part-time position to a full-time Package Car Driver position on five separate occasions between 2006 and 2011. Rodgers asserts claims against UPS for race discrimination under Title VII and 42 U.S.C. § 1981.  For the reasons discussed below, UPS's motion for summary judgment is due to be GRANTED.

## I. JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  Additionally, UPS has not argued that the Court does not have personal jurisdiction over it, and the Court finds adequate allegations supporting both.  Venue is appropriate pursuant to 28 U.S.C. § 1391.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine dispute of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by their own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine [dispute] for trial.'" *Id.* at 324 (internal quotations omitted). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A plaintiff must present evidence demonstrating that it can establish the basic elements of its claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without

specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

### III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion. The submissions of the parties, taken in the light most favorable to Rodgers, the non-moving party, establish the following material facts:

UPS is a package delivery company. Rodgers is currently employed at UPS's Enterprise, Alabama package facility as a part-time Sorter on the local sort, but has previously held other part-time positions at the Enterprise facility. Rodgers has worked continuously at UPS's Enterprise facility since September 25, 1995. The only full-time bargaining unit position in the Enterprise Center is the position of Package Car Driver. Package Car drivers are responsible for package pickup and delivery.

Rodgers's position is classified as a bargaining-unit position. Accordingly, the terms and conditions of Rodgers's employment are governed by the Collective Bargaining Agreement ("CBA") negotiated between UPS and the Teamsters Union ("Union"). Most

relevant to this dispute, the CBA's provisions regulate the promotion of employees in part-time bargaining-unit positions to full-time bargaining-unit positions.  Pursuant to the CBA, a part-time bargaining-unit employee who wishes to transfer to a full-time position must sign the part-time-to-full-time transfer list to remain eligible for the promotion.  This transfer list is commonly known as a "bid sheet."  Bid sheets are periodically posted in the Enterprise facility on a bulletin board accessible to part-time employees.  Union representatives are responsible for notifying part-time employees when a new bid sheet has been posted.  A member of UPS management and a Union representative are required to sign each bid sheet when they are posted and removed.  This requirement, however, is not always followed.

In order to remain eligible for a promotion, part-time employees are required to sign their name on each newly posted bid sheet.  When a full-time position becomes available, UPS turns to the most recently posted bid sheet to determine eligibility.  UPS is required to offer the position to the most senior qualified part-time employee who signed the relevant bid sheet.  Seniority is based on the date at which a part-time employee began working at the Enterprise facility rather than on the employee's date of hire.  If the most senior employee who signed the bid sheet declines the position, UPS must offer it to the next most senior part-time employee who signed the bid sheet.

Rodgers is aware of the CBA procedure for part-time-to-full-time transfers at the Enterprise package facility and recognizes that part-time employees are required to sign each bid sheet in order to be eligible for a promotion to a full-time position.  Rodger has signed a number these bid sheets over the course of his tenure at UPS, but he has not signed them

all.

## A.    The 2006 Incident

In 2006, Rodgers signed the relevant bid sheet and was selected for a promotion to a full-time Package Car Driver position on the basis of his seniority.  All full-time package car drivers are required to complete a UPS Driver Training course within 120 days of being promoted.  Mark Schwartz ("Schwartz") was appointed to train Rodgers.  Rodgers testified that Schwartz purposefully neglected his training duties by refusing to accompany Rodgers on some scheduled training rides and, when he did accompany Rodgers, refusing to answer Rodgers's questions.  Rodgers further testified that Schwartz purposefully provided this inadequate training so that Rodgers could not qualify for the full-time position and UPS could subsequently promote the next most senior employee, a Caucasian male named Jason Smith ("Smith").  As a result of the deficient training, Rodgers disqualified himself from the Package Car Driver position on June 19, 2006, and resumed his position as a part-time employee.

Based on his belief that Schwartz's decision not train him was a calculated attempt by UPS to fill the full-time Package Car Driver position with a white employee, Rodgers filed a grievance with the Union.[1]  Rodgers's grievance was based both on improper training

---

[1] The CBA also governs procedures for resolving grievances against UPS filed by Union members.  Once a grievance is filed, a local-level hearing is held.  At the local-level hearing, UPS representatives meet with Union representatives to discuss the merits of the grievance and attempt to reach a mutually satisfactory resolution.  If unsuccessful, what is known as "the panel hearing" is held.  At "the panel hearing," three Union representatives who are not UPS employees and three UPS representatives (usually UPS personnel from other districts) hear the dispute.  Unless the panel deadlocks, the decision reached by the panel is final and binding on both UPS and the Union.  If the

and race discrimination.  At the local-level hearing, the dispute was resolved in UPS's favor.

Rodgers did not appeal the decision and did not file an EEOC Charge.

**B.     The 2008 Incident**

In March 2008, Rodgers claims he was improperly denied three promotions to full-time Package Car Driver.  UPS instead filled these positions with three less-senior Caucasian employees:  Brandon Salter ("Salter"), Daniel Simmons ("Simmons"), and Brian Walls ("Walls").  UPS promoted Salter, Simmons, and Walls because they were the most senior employees whose signatures appeared on the relevant bid sheet, which was dated December 24, 2007.  However, Rodgers maintains that he signed a bid sheet for the Package Car Driver position on January 3, 2008, and that an African-American co-worker, JoAnna Lawson ("Lawson"), who also signed that bid sheet, witnessed his signature.  Rodgers further contends that the bid sheet relied upon by UPS to make the March 2008 promotions only contained signatures of Caucasian employees even though both he and Lawson signed it. While Rodgers cannot explain why his signature was not on the bid sheet relied upon by UPS, he testified that he took all the required steps to apply for promotion from a part-time to full-time position, that he was entitled to promotion as the most senior qualified employee, and that UPS failed to promote him based on his race and in violation of CBA procedure. Now, Rodgers always asks a fellow employee to witness him sign part-time-to-full-time bid sheets.

Rodgers  did  not  file  a  grievance  with  the  Union  based  on  this  alleged  race

_____

panel deadlocks, the dispute is referred to an arbitrator for a final, binding decision.

discrimination because the grievance would have been untimely when he first learned of the alleged misconduct.  Rodgers also did not file an EEOC Charge based on this purported conduct by UPS.

**C.     The 2011 Incident**

In September 2011, Rodgers claims he was again improperly denied a promotion from part-time employee to a full-time Package Car Driver position when UPS filled an open position with a less-senior Caucasian employee, Derek Goodson ("Goodson").  The circumstances surrounding this promotion are similar to those in March 2008.

According to UPS, the Enterprise facility Business Manager notified Tony Cooper ("Cooper"), the facility's On-Road Supervisor, that a full-time Package Car Driver position was open.  Consistent with the CBA, Cooper was directed to offer the position to the most senior part-time employee who had signed the most current bid sheet.  Cooper testified that, after receiving this instruction, he pulled the file containing part-time-to-full-time bid sheets and located the most current sheet, which was dated August 18, 2011. (Doc. #1-1, Ex. A.)[2] Based on the signatures on this sheet, Cooper offered the position to the most senior employee, Marie Dannelly ("Dannelly").  After Dannelly declined, Cooper offered the position to Goodson.  Goodson was the next most senior employee who had signed the

---

[2]  Cooper's job description did not require him to post or to take down bid sheets, nor did it require him to make promotion decisions. However, he made the promotion decision in this case at the instruction of his superior.

August 18, 2011 bid sheet.[3]  Goodson accepted the position and was promoted to full-time Package Car Driver on September 26, 2011.

Rodgers does not dispute that his signature is absent from the August 18, 2011 bid sheet.  However, Rodgers claims that he signed a different part-time-to-full-time bid sheet, which was also posted on or around August 18, 2011.  Rodgers testified that the bid sheet he signed had the initials "TC" in the upper right-hand corner.  He further testified that he was the first person to sign the bid sheet and that Rosie Montes ("Montes") and Gabe Childs ("Childs"), fellow part-time workers, signed after him.

Montes testified that Rodgers and Childs accompanied her to sign a bid sheet on or around August 18, 2011.  In addition to any part-time-to-full-time bid sheets, separate bid sheets for other transfers and promotions were also posted.[4]  According to Montes, the trio took down the bid sheets and passed them around, each employee signing each bid sheet.  Montes testified that she signed the bid sheets first, then Childs, then Rodgers.  Montes explained there were probably two or three different part-time-to-full-time bid sheets in the stack and she believed Rodgers had signed all of them.

Childs testified that he and Rodgers signed the part-time-to-full-time bid sheets together "every time" and thus "just about every time we signed one, one of us was a witness

---

[3]   There is no dispute that Cooper followed CBA policy when selecting for promotion the most senior employee who had signed the current bid sheet.  Although there were two employees with earlier employment dates who had also signed the bid sheet, neither of them was more senior than Dannelly or Goodson because both started working at the Enterprise facility after Dannelly and Goodson.

[4]   For example, according to Montes, UPS also posts similar bid sheets for the positions of loader, unloader, clerk, car washer, and porter.

for the other." Childs specifically testified that he the saw Rodgers sign the August 18, 2011 bid sheet that Cooper relied on. However, when shown the bid sheet, Childs acknowledged that Rodgers's signature was not present and stated that he did not witness someone remove Rodgers's name.

Finally, a part-time supervisor, Daryl Harper ("Harper"), testified that Rodgers asked him to witness Rodgers sign a bid sheet on or around August 18, 2011. However, Harper was not sure whether the bid sheet he witnessed Rodgers sign was the August 18, 2011 bid sheet relied upon by Cooper or a different one. When asked whether he thought anyone removed Rodgers's name from the August 18, 2011 bid sheet, Harper stated that it was "possible."

Cooper was not aware of any part-time-to-full-time bid sheet signed by Rodgers dated on or around August 18, 2011. Cooper testified that the August 18, 2011 bid sheet he relied on was the most recent part-time-to-full-time bid sheet on file and that he did not see any other bid sheets dated 2011 in the file.[5] Because the handwriting on the bid sheet was written by the manager responsible for posting bid sheets at the time, Cooper had no reason to doubt its authenticity. Cooper acknowledges that the bid sheet he relied on did not contain the initials of the UPS or Union representatives as required by the CBA. Cooper also acknowledges that this bid sheet did not have the initials "TC" in the corner, as Rodgers recalls the bid sheet he signed as having. Cooper denies tampering with, falsifying, or

---

[5] UPS has no record of, and neither party could produce, any bid sheet from on or around August 18, 2011 signed by Rodgers.

removing anyone's name from the bid sheet he relied on, and he is not aware of any employees or supervisors at the Enterprise facility who have done so. Because Rodgers's signature was not on the most recent bid sheet Cooper was aware of, Cooper could not have offered him a Package Car Driver position under the terms and conditions of the CBA; instead Cooper was required to offer the position to the most senior employee whose signature was on the bid sheet, which was Dannelly.[6] Had Rodgers' signature been on this bid sheet, Rodgers would have been the most senior qualified part-time employee eligible for the full-time position and thus would have been entitled to the promotion.

**D.   Rodgers's Union Grievance**

On March 22, 2011, five months after Goodson was promoted, Rodgers filed a formal grievance with the Union. Rodgers complained that UPS discriminated against him on the basis of race and violated his seniority when Cooper promoted Goodson, a less-senior Caucasian employee, to the Package Car Driver position. A local-level hearing was held on April 26, 2012. Rodgers was not in attendance but was represented by his Union Business Agent. UPS and the Union agreed that Rodgers's grievance was untimely because he failed to file it within five days of the alleged violation of his seniority. Even if the grievance had been timely, UPS and the Union also agreed that there had been no violation of the CBA because Rodgers's signature was not on the August 18, 2011 bid sheet. The Union notified Rodgers of the local-level hearing decision by letter on May 1, 2012. After receiving this

---

[6] The August 18, 2011 bid sheet was signed by Goodson, Montes, Childs, and Dannelley as well as fellow employees Laura Rowell, Demetrius Morris, and Joshua Yohn.

letter, Rodgers filed a formal charge of race discrimination with the EEOC on June 25, 2012.
The EEOC issued a right-to-sue letter on October 30, 2012.

Rodgers explains that his union grievance was untimely because he did not learn of
Goodson's promotion until January 2012.  Rodgers provides two reasons for this.  First,
Rodgers explained that Goodson's promotion was formally announced to UPS employees
at a morning meeting attended by Package Car Drivers and management.  Because Rodgers
was a part-time employee, and because the meeting was not held during his shift, Rodgers
was not in attendance.  Second, Rodgers testified that he could have learned of Goodson's
promotion from the UPS Seniority List, a document listing part-time employee positions and
seniority date.  These lists are customarily updated and posted on the first Monday of each
January, April, July, and October.  If it had been posted, Rodgers could have checked the
October Seniority List and noticed that Goodson's name was no longer present, indicating
that he had been promoted to a full-time position.  However, no October Seniority List was
posted.  Thus, Rodgers learned of the promotion in January 2012, the next posting date.


**E.**     **Rodgers's Subsequent Refusals to Accept the Package Car Driver Position**

Rodgers has been offered the Package Car Driver position based on his seniority four
times in 2013: once in March and April 2013 and twice in August 2013.  Rodgers declined
the position each time.

## IV. DISCUSSION

Rodgers asserts race discrimination claims against UPS under Title VII and § 1981[7] based on UPS's failure to promote him to Package Car Driver once in 2006, three times in March 2008, and once in 2011.  However, Rodgers concedes that any potential claims based on the 2006 and 2008 incidents are time-barred.  (Doc. #26.)  Accordingly, summary judgment is GRANTED in favor of UPS on Rodgers's 2006 and 2008 failure to promote claims.   The only claims remaining before the Court are Rodgers's Title VII and § 1981 race discrimination claims arising from Goodson's September 2011 promotion.

### A.    Timeliness of Rodgers's 2011 Title VII Claim

UPS first contends that Rodgers's Title VII claim arising from the 2011 incident is time-barred.  A plaintiff may only pursue a Title VII discrimination claim after exhausting his administrative remedies.  *Wilkerson v. Grinnel Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).  To exhaust his administrative remedies, a plaintiff must file a timely charge of discrimination with the EEOC.  *Id.* (citing 42 U.S.C. § 2000e-5(b)).  In a non-deferral state, such as Alabama, a plaintiff must file a charge of discrimination with the EEOC within 180 days after the date of the alleged discrimination.  29 C.F.R. § 1626.7(a); *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1214 n.2 (11th Cir. 2001).  A failure to promote is a

---

[7]  UPS points out that Rodgers's complaint also brings race discrimination claims under § 1983.  However, § 1983 does not apply in this case because UPS is a private employer not acting under color of state law.  *See Givhan v. Electronic Engineers, Inc.*, 4 F. Supp. 2d 1331, 1337 (M.D. Ala. 1998) (rejecting employment discrimination claims under § 1983 because plaintiff could not show defendant private employer acted under color of state law, as required by § 1983).  Thus, to the extent Rodgers brings claims for race discrimination under § 1983, summary judgment is GRANTED in favor of UPS.

"discrete act" that triggers the exhaustion period. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). A plaintiff's claims are barred if they do not file a timely charge of discrimination. *Alexander v. Fulton Cnt., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2002). The plaintiff has the burden of establishing that an EEOC Charge was timely filed. *Jordan v. City of Montgomery*, 283 Fed. App'x 766, 767 (11th Cir. 2008).

The alleged discrimination occurred on or around September 26, 2011, when Goodson was promoted from part-time employee to full-time Package Car Driver. Thus, to be timely, Rodgers's EEOC Charge must have been filed within 180 days, on March 24, 2012. It is undisputed that Rodgers filed his EEOC Charge on June 25, 2012, 273 days after the alleged discriminatory act, making it untimely.

Acknowledging that his EEOC charge was not timely filed within 180 days of the alleged misconduct, Rodgers argues the filing period was equitably tolled, and, thus his Title VII claim is not time-barred. The requirement that a plaintiff file "a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to sue in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *See Stafford v. Muscogee County Bd. of Educ.*, 688 F.2d 1383, 1387 (11th Cir. 1982) (citing *Zipes v. Transworld Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Under the doctrine of equitable tolling, a limitations period does not start to run until the facts that would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights. *Sturnolio v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994) (citing *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 931

(5th Cir. 1975)[8]). Courts are hesitant to apply this doctrine unless extraordinary circumstances exist, such as when the defendant has misled the plaintiff or deliberately attempted to conceal the alleged discrimination. *See Manning v. Carlin*, 786 F.2d 1108, 1109 (11th Cir. 1986) (citing *Chappell v. Emco Machine Works Co.*, 601 F.2d 1295 (5th Cir. 1979)); *see also Reeb*, 516 F.2d at 931. These "extraordinary circumstances" must be "both beyond [the plaintiff's] control and unavoidable even with diligence." *See Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999); *see also Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993) (equitable tolling "is an extraordinary remedy which should be extended only sparingly"). The plaintiff bears the burden of establishing that equitable tolling is appropriate. *See Jones v. Wynne*, 266 Fed. App'x 903, 905 (11th Cir. 2008) (citations omitted).

Rodgers argues that he did not learn of the promotion until the January 2012 Seniority List was posted because the promotion was not directly communicated to him verbally or in writing and because no change in Goodson's job duties were perceptible. Although there is conflicting evidence concerning the date Rodgers became subjectively aware of Goodson's promotion,[9] Rodgers should have been aware of Goodson's promotion well before January

---

[8] All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[9] Harper testified that another employee informed him and Rodgers of Goodson's promotion "near the end of the year." When asked if Rodgers actually heard this information, Harper replied "yes" and testified that he and Rodgers had a "brief" conversation about the fact that he had not been offered the promotion instead of Goodson. Montes, however, testified that she had a conversation with Rodgers about Goodson's promotion "shortly after [Goodson] had started driving."

2012.  It is undisputed that UPS did not deliberately conceal Goodson's promotion or otherwise hinder Rodgers's efforts to discover the status of the open position.  To the contrary, UPS announced Goodson's promotion to UPS management and other Union employees on or about September 26, 2011, shortly after the promotion became official. Although Rodgers was not in attendance at this meeting, this certainly was not the exclusive time for him to have learned of the promotion.  Rodgers himself testified that at the time he allegedly signed the part-time-to-full-time bid sheet, on or around August 18, 2011, he was aware that another driver had retired and that a full-time position would be coming open in the near future.  Indeed, Rodgers testified that he recruited witnesses to watch him sign the bid sheet because he anticipated that Cooper would select Goodson over him in spite of the seniority policy.  Armed with this knowledge, and with these suspicions, it was unreasonable for Rodgers not to have made a single inquiry into the status of the position between the time he signed his bid sheet and the time he learned the position had been filled, over four months later.[10]

It became even more unreasonable for Rodgers not to have made an inquiry into the status of the position when the October Seniority List was not posted as he expected, a

_____

[10] Moreover, once Rodgers did subjectively discover the alleged discrimination, on or around January 2012, he still waited approximately two and half months to file his union grievance and at least 175 days to file his EEOC charge.  Although perhaps not directly relevant to the issue of when he knew or should have know of UPS' alleged misconduct, it certainly cautions against giving Rodgers the benefit of this extraordinary remedy.  *See, e.g.*, *Reeb*, 516 F.2d at 926 (noting that plaintiff "immediately" filed her EEOC charge within 7 days of learning of the misconduct).

circumstance that may have confirmed his suspicions.[11]   When Rodgers did not find the Seniority List posted in October, it certainly would have been reasonable to ask Cooper for a copy, in which case he could easily have confirmed or denied whether the promotion had been awarded.   There is no evidence UPS would have misled Rodgers had he asked about the promotion.  *Cf. Alexander v. Vesta Ins. Group, Inc.*, 147 F. Supp. 2d 1223, 1232-33 (N.D. Ala. 2001) (tolling limitations period where plaintiffs suspected race discrimination but were expressly assured that facts existed suggesting no misconduct).   Rodgers cannot now benefit from UPS's failure to post the Seniority List when he did not inquire into its existence at the time.

Because Rodgers made no attempts whatsoever to discover whether the full-time position he expected to be open had been filled within four months of allegedly signing a bid sheet, and because there is no evidence UPS actively concealed Goodson's promotion or otherwise wrongfully misled Rodgers, Rodgers could have timely filed his EEOC charge if he had exercised diligence.   Thus, he has not met his burden of showing extraordinary circumstances such that the 180-period should be equitably tolled.  *See Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 835–36 (8th Cir. 2002) (refusing to equitably toll limitations period in ADEA case where promotions were never posted or communicated to plaintiffs but plaintiffs had suspicions of discriminatory conduct and failed to exercise requisite due diligence by not making any inquiry into whether the openings had been filled and by whom);

---

[11]  Rodgers does not argue that UPS's failure to post the Seniority List was for the purpose of keeping him from timely filing an EEOC charge.

*Amini v. Oberlin College*, 259 F.3d 493, 501–02 (6th Cir. 2001) (finding that regularly checking defendant's website and physically checking defendant's announcement boards for new hire information was not "requisite diligence" to justify equitable tolling because plaintiff never contacted defendant to ask whom it had hired and defendant had not otherwise refused or delayed plaintiff's efforts); *see also Stanley v. Lawrence Cnty. Comm'n*, No. 5:11-cv-01583, 2014 WL 358723, at \*7–8 (N.D. Ala. Jan 31, 2014) (discussing the level of reasonable diligence required to justify the benefits of equitable tolling in the context of the 180-day limitations period in a Title VII claim).

Finally, Rodgers argues that the 180-day limitation period should be tolled during the time he spent pursuing his Union grievance. It is well-settled that "[t]he pursuit of these independent remedies does not affect [Rodgers's] duty to assert his Title VII claims within the limitations period." *Stafford*, 688 F.2d at 1388–89 (citing *Delaware State College v. Ricks*, 449 U.S. 250, 261 (1980); *Int'l Union of Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 236–40 (1976)). Accordingly, Rodgers filing a Union grievance did not toll the 180-day limitations period.

Because the Court finds that the 180-day limitations period was not tolled, Rodger's remaining Title VII claim is time-barred.

## B. Rodgers's § 1981 Claim

Rodgers's race discrimination claim under § 1981 is based on UPS's failure to promote him to Package Care Driver in September 2011. Rodgers has presented no direct evidence of discrimination, and the parties agree that the *McDonnell Douglas* framework for

circumstantial evidence of discrimination applies to this case.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a prima facie case of racial discrimination under the *McDonnell Douglas* framework in the context of a failure to promote, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for and applied for a position that the employer was seeking to fill; (3) despite qualifications, he was rejected; and (4) the position was filled with an individual outside the protected class.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).  Once the employee has established a prima facie case of disparate treatment, the burden of production, but not of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Vessels*, 408 F.3d at 770–71.  This burden involves no credibility determination and is "exceedingly light," but it does require the employer to articulate a "clear and reasonably specific" non-discriminatory basis for its decision.  *Id*. at 770 (quoting *Tex. Dep. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)).

After the employer meets its burden to produce a non-discriminatory reason for its actions, the presumption of discrimination is eliminated.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000).  The burden then shifts to the employee to prove the employer's proffered reason was a pretext for discrimination.  *Id*.  "To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination."  *Vessels*, 408 F.3d at 771 (citation omitted).  To show pretext, an employee must "meet [the reason] head on and rebut it."  *Wilson v. B/E*

18

*Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).  A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  In the context of a promotion, an employee cannot prove pretext by simply arguing or showing that he was better qualified than the person who received the position; he must show not merely that the employer's decision was mistaken but that it was in fact motivated by race.  *Springer v. Convergys Customer Mgmt. Grp, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007).

### 1.  Prima Facie Case

UPS argues that Rodgers has failed to establish a prima facie case of racial discrimination with respect to his failure to promote claim.  Specifically, UPS contends that the second, third, and fourth prongs of the *McDonnell Douglas* framework are not met.  The Court disagrees.  Taking the evidence in the light most favorable to Rodgers, the non-moving party, Rodgers has met the burden of establishing a prima facie case of race discrimination.

The second prong requires Rodgers to show that he was qualified, and actually applied, for the Package Car Driver position.  It is undisputed that Rodgers was qualified.  In the Eleventh Circuit, if "an employer has a formal system of posting vacancies and allowing employees to apply for such vacancies, an employee who fails to apply for a particular position cannot establish a prima facie case of discriminatory failure to promote." *Giles v. BellSouth Telecommunications, Inc.*, 542 Fed. App'x 756, 760 (11th Cir. 2013) (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004)); *see also Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003) (reaching the same conclusion in

an ADEA reduction-in-force case). However, "[w]here an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show that he applied for the position—only that the employer had some reason to consider him for the position." *Vessels*, 408 F.3d at 768; *see also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133-34 (11th Cir. 1984) ("[W]hen an employer uses such informal methods it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed interest.").[12]

Under the terms and conditions of the CBA, UPS periodically posts bid sheets on which an employee can "apply" for a vacant position by signing their name. The Union is responsible for notifying part-time bargaining unit employees that a bid sheet has been posted. When a position comes open, UPS is required to offer the position to the most senior part-time employee who signed the most current bid sheet. Rodgers acknowledges that he was aware of the CBA procedure, that a bid sheet had been posted, and that he was required to sign the bid sheet in order to remain eligible for the full-time position. Thus, the CBA procedure employed by UPS is undoubtedly a formal system for posting and filling vacant full-time positions. Accordingly, to establish the second prong, Rodgers must have actually

---

[12] A plaintiff can also establish a prima facie case of discrimination without having applied for the position if he can show that he had a "justifiable belief" that the employer's hiring practices made application futile. *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002). Rodgers does not argue that he failed to apply for the position because he believed signing the bid sheet was futile. Rather, because Rodgers argues that he actually applied for the Package Car Driver position, this exception does not apply.

applied for the position by signing his name on the relevant bid sheet. *See Giles*, 542 Fed. App'x at 760; *Smith*, 352 F.3d at 1345. Whether Cooper knew of Rodgers's interest in the promotion or had some reason to consider him for the Package Car Driver position is not relevant.

UPS argues that Rodgers's inability to produce a bid sheet with his signature on it from on or around August 18, 2011, or to otherwise show that he signed the bid sheet Cooper relied on, is fatal to his claim because without it Rodgers cannot show that he actually applied for the promotion. To support its argument, UPS cites a number of cases barring a plaintiff's claim where a company employs a formal application process and the plaintiff did not actually apply. *See, e.g.*, *Webb v. Int'l Bus. Machs. Corp.*, 458 Fed. App'x 871, 877 (11th Cir. 2012) (granting summary judgment where plaintiff failed to apply); *Howell v. Compass Grp.*, 448 Fed. App'x 30, 34 (11th Cir. 2011) (same); *Harris v. Warehouse Servs., Inc.*, 77 F. Supp. 2d 1240, 1247 (M.D. Ala. 1999) (same). However, these cases are inapposite. In each case, it was undisputed that plaintiff had not applied for the relevant position and therefore could not establish a prima facie case. In this case, however, there is a disputed issue with regard to whether Rodgers actually signed the bid sheet and, thus, formally applied. At summary judgment, Rodgers need only present admissible evidence sufficient to create a triable issue of fact. *Celotex*, 477 U.S. at 322. Here, Rodgers himself testified that he signed a part-time-to-full-time bid sheet on or around August 18, 2011. Moreover, Childes, Montes, and Harper all testified that they witnessed Rodgers signing the bid sheet on or around that date. The jury would certainly be permitted to conclude Rodgers had in

21

fact applied based on this testimony even though he does not have a copy of the bid sheet allegedly bearing his signature. Rodgers is thus able to establish the second prong.

Rodgers also meets the burden of establishing the third and fourth prongs. The third prong requires Rodgers to show that he was rejected for the position in spite of his qualifications. It is undisputed that Rodgers was not selected for the Package Car Driver position and that had his signature been on the bid sheet relied upon by Cooper or on a bid sheet otherwise tampered with, destroyed or disregarded, he would have been the most senior applicant. Accordingly, Rodgers satisfies the third prong.

The fourth prong requires Rodgers to show that the Package Car Driver position was filled by an individual outside the protected class. To establish this prong, Rodgers must show that he and Goodson were similarly situated "in all relevant respects." *McNeal v. City of Tarrant*, 325 Fed. App'x 794, 796 (11th Cir. 2009). Both Rodgers and Goodson were part-time bargaining unit employees working at UPS on or around the time the August 18, 2011 bid sheet was posted. UPS recognizes that Goodson, a less-senior white employee outside Rodgers's protected class, was selected for the position but argues that he and Rodgers were not similarly situated because Rodgers's name was not on the bid sheet relied upon by Cooper. Again, however, Rodgers is not required to produce a bid sheet with his signature to show that he and Godson were similarly situated. At this point in the proceedings, his testimony, along with testimony of Montes, Childs, and Harper, establishes that he indeed applied for the position and that a similarly situated employee outside his protected class was selected for the Package Car Driver position.

### 2. UPS's Legitimate Non-Discriminatory Reason

The burden now shifts to UPS to articulate a legitimate, non-discriminatory reason for not promoting Rodgers to the Package Car Driver position. Under the CBA procedure, UPS is required to promote the most senior part-time employee who had signed the current part-time-to-full-time bid sheet. To be eligible for promotion, it was the part-time employee's responsibility to sign the most current posted bid sheet. An employee who does not sign the bid sheet can not be selected for a promotion. UPS explains that Rodgers was not offered the full-time Package Car Driver position because his signature was not on the most recent part-time-to-full-time bid sheet. Instead, Cooper offered the position to Dannelly, the most senior part-time employee who had signed the bid sheet. After Dannelly declined the position, pursuant to CBA procedure, Cooper offered the position to the next most senior part-time employee who had signed the relevant bid sheet, Goodson, who accepted the position. UPS has met the "exceedingly light" burden of producing a non-discriminatory reason for not promoting Rodgers. *See Vessells*, 408 F.3d at 770–71.

### 3. Pretext

Because UPS met its burden of producing a non-discriminatory reason for the alleged misconduct, the burden shifts back to Rodgers to establish that UPS's proffered reason was pretext for discrimination. Rodgers has not provided any explanation, let alone an explanation supported by sufficient evidence, to explain what happened to the bid sheet he allegedly signed. Rather, he implies that Cooper, perhaps in concert with other UPS employees, employed a scheme to tamper with, destroy, doctor, or otherwise disregard the

bid sheet Rodgers had signed in order to promote Goodson on the basis of his race.  There is no evidence to support this implication.  The facts support the opposite conclusion. Cooper, following CBA procedure, did not first award the position to Goodson but instead to the most senior employee who had signed the bid sheet, Dannelly.  Goodson was only awarded the job after Dannelly declined it.  Cooper's faithful adherence to the CBA procedure when awarding the promotion strongly supports a finding that the promotion decision was not based on race.  Indeed, wholly absent from the record is any affirmative evidence of misconduct by Cooper, the decision-maker, or any other UPS employee.

Without any evidence of misconduct, Rodgers attempts to show pretext by pointing to a number of alleged "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [UPS's] proffered reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  The evidence Rodgers presents in an attempt to poke holes in UPS's legitimate reason for selecting Goodson is insufficient to create a genuine dispute of fact.

To show pretext, Rodgers first directs the Court to evidence suggesting he did in fact sign a bid sheet on or around August 18, 2011, and, therefore, he had properly applied for the position. This evidence, he argues, suggests both that UPS's proffered reason is "false" and that Goodson's promotion was motivated by racial bias.  *See Hicks*, 509 U.S. at 515. Rodgers argument misses the mark.  At bottom, "[t]he inquiry into pretext centers on the employer's beliefs, not on the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.*,

610 F.3d 1253, 1266 (11th Cir. 2011); *see also Pressley v. Haeger*, 977 F.2d 295, 297 (7th Cir. 1992) ("Racial discrimination is an intentional wrong.  An empty head means no discrimination.").  Accordingly, whether Rodgers actually signed a part-time-to-full-time bid sheet is irrelevant.  What is relevant is whether Cooper was aware of a current bid sheet signed by Rodgers, and, if he was, whether Cooper disregarded it for discriminatory reasons. There is simply no evidence on the record suggesting Cooper was subjectively aware of a current part-time-to-full-time bid sheet bearing Rodgers's signature and that he disregarded or tampered with it based on racial animus.  Indeed, the most current bid sheet of which Cooper was aware did not contain Rodgers's signature, despite the fact that Rodgers has testified that he signed a bid sheet around that same time.  In short, Cooper did not believe Rodgers had applied for the promotion and was barred under the terms of the CBA from awarding it to him.

Second, Rodgers argues that even if Cooper was not subjectively aware of another bid sheet containing his signature, Cooper discriminated against him by relying on the August 18, 2011 bid sheet despite knowing it was inauthentic, unreliable, or otherwise not genuine. Rodgers points to two inconsistencies the he argues put Cooper on notice that the August 18, 2011 bid sheet should not have been relied on.  First, Rodgers argues that because he signed almost every bid sheet in his twenty-year tenure at the Enterprise facility, Cooper should have known he was interested in the position.  Thus, Cooper should have questioned the authenticity of the August 18, 2011 bid sheet when he realized Rodgers's signature was not

present.  Second, Rodgers points to the fact that the bid sheet relied upon by Cooper was not

initialed by the UPS manager and Union steward after it was posted and before it was taken

down, as required by the CBA.  Rodgers argues that the absence of these initials also

undermines the legitimacy of the August 18, 2011 bid sheet such that Cooper should have

known it was not legitimate.

Rodgers's argument in this regard is pure speculation.  Even if these "inconsistencies"

were evidence that Cooper *should* have questioned the reliability of the August 18, 2011 bid

sheet, there is no evidence that they in fact *did* cause him to question the bid sheet's

authenticity.  *See id.* at 1266.  First, Cooper denied having found it "odd" or "out of the

ordinary" that Rodgers's signature was not on the bid sheet.  Cooper explained that Rodgers

already had a full-time job and that he believed Rodgers had been offered cover driver and

full-time job positions in the past but that he always turned them down.  Moreover, there are

other bid sheets on the record that Rodgers admits he did not sign.  Second, even though the

bid sheet was not initialed pursuant to the terms of the CBA, it is undisputed that bid sheets

were not always initialed by a UPS manager and Union steward.  Cooper himself testified

that he did not sign or initial any part-time-to-full-time bid sheet posted at the Enterprise

center prior to 2013.[13]   Accordingly, the absence of UPS management and Union steward

initials would not have made Cooper question the authenticity of the August 18, 2011 bid

---

[13] Cooper specifically testified that he did not have a reason to discredit the August 18, 2011 bid sheet.  Most importantly, Cooper recognized the handwriting on the top of the bid sheet as that of the business manager responsible for posting the bid sheets.

sheet. Therefore, it is insufficient to discredit UPS's reason for not promoting Rodgers. Moreover, a single inconsistency on the bid sheet is not sufficient to show that UPS's reason for promoting Goodson was false. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").[14]

Finally, Rodgers argues that evidence of past discrimination is sufficient to establish pretext.[15] Rodgers argues that pretext can be inferred from the 2006 incident, in which he was promoted to Package Car Driver but inadequately trained on the basis of his race, and

[14] Rodgers points to other alleged deviations from UPS's established policies and argues that they are suggestive of UPS's intent to suppress Goodson's promotion and hide its discriminatory actions. Specifically, Rodgers argues that UPS's failure to directly notify him of Goodson's promotion and UPS's decision to hold a local-level hearing without him in attendance, all in violation of company policy, demonstrate UPS's intent to cover up alleged discrimination. However, there is no indication that UPS has a policy or practice of notifying part-time employees as to who received Package Car Driver promotions and it is undisputed that the Union, not UPS, is responsible for keeping members informed about the grievance process. Rodgers also argues that UPS's failure to post the October Seniority List is evidence of UPS intent to cover up Goodson's promotion. While UPS concedes that it was required by its policy to post this list, Rodgers has not shown any evidence that the reason it was not posted was in order to hide Goodson's promotion. Rather, it is undisputed that UPS announced the promotion to Rodgers's fellow Union members shortly after Goodson became a full-time Package Car Driver. Rodgers has failed to show that UPS's alleged deviations from company policy are evidence of discrimination on the basis of his race.

[15] Rodgers also points out that Montes, Childs, and Harper all testified about other examples of disparate treatment at the Enterprise facility. However, these vague accusations, unsupported by corroborating evidence, are insufficient to demonstrate pretext on Cooper's behalf. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("[T]he plaintiff . . . must present concrete evidence in the form of specific facts that show the defendant's proffered reason is mere pretext."); *see also Foster v. Biolife Plasma Servs., LP*, No. 13-13883, 2014 WL 1929759, at *3 (N.D. Ala. May 14, 2014) (finding testimony about employer's alleged racial bias, which was speculative and not based on personal knowledge, insufficient to oppose a motion for summary judgment).

the 2008 incidents, in which he was not promoted to Package Car Driver even though he allegedly signed the most current bid sheet. Even assuming *arguendo* that the 2006 and 2008 incidents were race discrimination, Rodgers must still show some connection between the prior discriminatory acts and the decision he is currently challenging. Here, it is undisputed that Cooper did not participate in the 2006 and 2008 incidents and, thus, they are not evidence of pretext.

"[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, nondiscriminatory reasons for its actions." *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987). Rodgers's speculation that Cooper somehow manipulated the CBA's seniority-based system for making part-time-to-full-time promotions is not supported by the record before this Court. Rodgers is simply unable to produce any substantial evidence that Cooper was aware Rodgers had applied for the full-time position but disregarded the application on the basis of his race. *See Early* 907 F.2d at 1081. Rather, the undisputed facts clearly show that, pursuant to the terms of the CBA, Cooper first offered the Package Car Driver promotion to the most senior part-time employee who had signed the only current part-time-to-full-time bid sheet Cooper was aware of. Thus, Cooper's § 1981 race discrimination claim fails and summary judgment is due to be GRANTED in UPS's favor.

**V. CONCLUSION**

Based on the foregoing, it is hereby ORDERED as follows:

1.      UPS's Motion for Summary Judgment (Doc. #21) is GRANTED as to all of Plaintiff's claims.

2.      The pretrial hearing and trial of this case are CANCELLED.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this the 7th day of July, 2014.

                          /s/  Mark E. Fuller
                    UNITED STATES DISTRICT JUDGE